UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD J. ULRICH ASSOCIATES, INC.,

    Plaintiff,

v.

BILL FORGE PRIVATE LIMITED,

    Defendant.

Case No. 17-cv-10174

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
R. STEVEN WHALEN

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#73]**

**I. INTRODUCTION**

Plaintiff Donald J. Ulrich Associates, Inc. initiated this breach of contract suit on January 19, 2017, seeking recovery under both traditional and equitable theories. Dkt. No. 1; Dkt. No. 22. Defendant Bill Forge Private Limited moves for partial summary judgment on three claims encompassed within Plaintiff's First Amended Complaint. Dkt. No. 73. A hearing on Defendant's Motion was held on March 6, 2019. For the reasons set forth below, the Court will GRANT the Motion IN PART and DENY the Motion IN PART.

## II. BACKGROUND

**A. Original Sales Representation Agreement**

Defendant is a car parts manufacturer headquartered in Bangalore, India and Plaintiff is a Michigan-based company. Dkt. No. 73, p. 10 (Pg. ID 1288). In 2004, Plaintiff and Defendant entered into a contract, whereby Plaintiff agreed to serve as Defendant's North American sales representative for major automotive customers in Southeast Michigan, including General Motors, Ford, and Fiat-Chrysler. Dkt. No. 22, p. 3 (Pg. ID 75). In return, Plaintiff would receive commission payments ranging from two to five percent of sales during the parties' relationship, and then for an additional five years post-termination. Dkt. No. 73, pp. 10-11 (Pg. ID 1288-89); *see* Dkt. No. 73-4. The parties' agreement was good for a period of three years, expiring in July 2007. Dkt. No. 73-4. The agreement could, however, be extended for successive two-year periods by mutual consent. *Id.*

On July 1, 2007, the parties renewed their 2004 agreement through December 31, 2008. Dkt. No. 73-9. The renewed agreement maintained the terms of the 2004 agreement, with a few exceptions. *Id.* Namely, the renewed agreement contained the following provision:

> In Clause 6 of the aforesaid [2004] Representation Agreement the commissioned rate shall always be deemed to have been payable and computable on the "manufacturing cost" and not on the "sales" to the customer.

*Id.* In December 2008, the parties again extended their contractual agreement, this time through March 31, 2009. Dkt. No. 73-10. The agreement contained the same terms specified in the July 1, 2007 agreement. *Id.* The parties also agreed in writing that they had no intent to renew this contract after March 31, 2009, and that the contract would have no legal effect beyond that date. *See id.* Still, Defendant would be required to pay Plaintiff post-termination commissions on existing business for a period of five years -- i.e., until March 31, 2014. Dkt. No. 73, p. 12 (Pg. ID 1290).

After the parties' agreement expired on March 31, 2009, they continued to work together. *See id.*; Dkt. No. 84, pp. 7-8 (Pg. ID 1777-78). In fact, Plaintiff asserts that the parties had an understanding that if new business developed, they would enter into a new sales agreement. Dkt. No. 84, p. 7 (pg. ID 1777). When new business did develop in 2012, Plaintiff claims both sides "began to discuss a new sales representative agreement that would apply to this new business once it went into production." *Id.* at p. 8 (Pg. ID 1778).

According to Plaintiff, the parties were not able to immediately reach a contractual agreement with respect to their new business relationship. *Id.* Hence, on May 30, 2013, the parties agreed to put off finalizing a new agreement until the post-termination obligations of their previous agreement expired on March 31, 2014. Dkt. No. 73-12. The parties also signed a document acknowledging that

after those post-termination obligations expired, Defendant "intend[ed] to avail [Plaintiff's] services on mutually acceptable terms for such time as [Plaintiff] wish[ed] to continue." *Id.* At this point is where the issues giving rise to the instant suit began.

**B. Negotiating a New Sales Representation Agreement**

On March 7, 2014, Plaintiff sent Defendant a proposed sales representation agreement ("Proposed March 2014 Agreement") that would govern the parties' relationship moving forward. Dkt. No. 73-13; Dkt. No. 73-14. The Proposed March 2014 Agreement would have provided Plaintiff with commission payments at a "standard rate of 3.5 percent" and post-termination commissions "for the life of the Product." Dkt. No. 73-14. Though the term "standard rate" was not defined in the Proposed March 2014 Agreement, one of Plaintiff's representatives would later testify that this meant a commission rate based on sales price, rather than on manufacturing cost. *See* Dkt. No. 84-3, p. 9 (Pg. ID 1830). It is unclear if Defendant had this same understanding. *See* Dkt. No. 84-8, p. 23 (Pg. ID 1917). Nevertheless, Defendant responded to Plaintiff's proposal on April 5, 2014 with an email stating: "In keeping with the understanding with our investors, any agreement that we wish to enter into will need their acceptance as well. Your proposed agreement, in it's [sic] current form, will not be accepted." Dkt. No. 73-15.

In addition to rejecting Plaintiff's Proposed March 2014 Agreement, Defendant countered with what it termed a Memorandum of Understanding ("MOU"). *Id.* The MOU proposed that the parties operate without a formal agreement for a period of twelve months, and that, in relevant part, Defendant would pay Plaintiff a three-percent commission based on "manufacturing cost" for any business in which Plaintiff's services were availed. Dkt. No. 73-16.

Plaintiff asserts that it rejected the proposed MOU during a phone call with Defendant in April 2014. Dkt. No. 84, p. 9 (Pg. ID 1779); Dkt. No. 73-2, p. 30 (Pg. ID 1346). Plaintiff also claims that during the phone call, the parties came to a verbal agreement on a new contract moving forward. According to Plaintiff, Defendant agreed to pay Plaintiff commissions at a rate of "3 percent of sales" and for the "life of the part." Dkt. No. 84-3, p. 26 (Pg. ID 1847). At the same time, however, Plaintiff acknowledges that Defendant would not sign a written agreement under these alleged terms until it was able to get the backing of its investors. *Id.* at p. 31 (Pg. ID 1852).

Roughly a year later, Plaintiff sent Defendant another proposed sales representation agreement ("Proposed April 2015 Agreement"). Dkt. No. 84-18. The Proposed April 2015 Agreement virtually mirrored the Proposed March 2014 Agreement, but with a few changes. Dkt. No. 84, p. 13 (pg. ID 84). One particular

change was that the Proposed April 2015 Agreement would have provided for commission payments "at the standard rate of 3 percent," rather than the 3.5 percent previously proposed. Dkt. No. 73-18, p. 4 (Pg. ID 1410). After receiving the Proposed April 2015 Agreement, Defendant emailed Plaintiff stating it would "study" it and refer it to its legal consultants. Dkt. No. 73-19; Dkt. No. 73-20.

In October 2015, the parties had a follow-up discussion regarding the Proposed April 2015 Agreement. Dkt. No. 84, p. 15 (Pg. ID 1785). Plaintiff sent Defendant an email -- dated October 8, 2015 -- which summarized that discussion. Dkt. No. 73-21. The email explained that the parties were working towards "a more formal agreement to cover in detail the terms and conditions" of a contract for the parties moving forward. *Id.* It noted that Defendant had been in possession of Plaintiff's Proposed April 2015 Agreement since last spring, and that Plaintiff "hope[d]" Defendant had a chance to review it in detail. *Id.* It further stated that Plaintiff "look[ed] forward to [Defendant's] comments," and acknowledged that based on their discussions, Defendant had at least one concern with the Proposed April 2015 Agreement surrounding post-termination commissions. *Id.* The email emphasized that Plaintiff would "await a more formal response to this concern." *Id.* Three days later, Defendant sent a reply email confirming Plaintiff's summary of the conversation and suggesting that Defendant would draft "a contract in 6 months latest which will address all concerns from both sides." *Id.*

On January 27, 2016, Plaintiff sent Defendant a letter objecting to some recent commission payments. Dkt. No. 73-22. Defendant had been paying Plaintiff a commission based on manufacturing cost, rather than on sales price. *Id.* The letter alleged, on one hand, that Defendant had verbally agreed to the Proposed April 2015 Agreement, which provided for commission payments at the "standard rate" of three percent. *Id.* In Plaintiff's eyes, this meant a commission based on sales price. *Id.* On the other hand, the letter acknowledged that Defendant had not agreed to at least one key provision in the Proposed April 2015 Agreement surrounding post-termination commissions. *Id.* Hence, the letter requested that Defendant provide Plaintiff with any "changes [it] propose[d]" as it related to that part of the contract. *Id.*

On January 29, 2018, Defendant sent Plaintiff an email in reply to Plaintiff's letter. Dkt. No. 73-23. Defendant maintained that it did not "remember any discussions or agreements in the past on commissions being payable on selling price." *Id.* And that in fact, all commission payments during the parties' relationship had been made on manufacturing cost. *Id.* Defendant informed Plaintiff that it was working on a sales representation agreement with its legal team, and that it would have a response to the Proposed April 2015 Agreement by February 1, 2016. *Id.* Plaintiff would later reply that it "look[ed] forward to the successful conclusion of the contract." *Id.*

Defendant did not provide Plaintiff with a response to the Proposed April 2015 Agreement by February 1. However, Defendant emailed Plaintiff on February 16, 2016 explaining that it needed additional time because the Proposed April 2015 Agreement was still under review by its business and legal consultants. Dkt. No. 73-29. Defendant hoped to get Plaintiff a response by the end of March. *Id.*

As the March deadline approached, Defendant sent Plaintiff another email asking for several points of clarification. *Id.* First, it asked Plaintiff to confirm that the two sides had been working without an agreement since March 31, 2014. *Id.* The reason for this question was that if there had been an agreement in place, then it would negate the need for the parties to work on a new agreement. Dkt. No. 73-31. Second, Defendant asked Plaintiff to confirm that commissions under any agreement would be payable on "3% of manufacturing cost," rather than a percentage based on sales price. Dkt. No. 73-29.

Plaintiff responded to Defendant's email on February 29, 2016. Dkt. No. 73-30. Plaintiff's email stated, "We clearly have an agreement for [Plaintiff] to represent [Defendant]. We just need to finalize the compensation terms." *Id.* The email also stated that Plaintiff was not agreeable to having commissions be paid on manufacturing cost, as opposed to on sales price. *Id.* Subsequent correspondence

further confirmed Plaintiff's position on the state of the parties' agreement: "We still need to reach an agreement as the correct commission rate to be applied to the sales price. We look forward to working with you to finalize our agreement on these points." *See e.g.*, Dkt. No. 73-33; Dkt. No. 73-34; Dkt. No. 73-35.

In July 2016, Defendant finally sent Plaintiff its proposed sales representation agreement ("Proposed July 2016 Agreement"). Dkt. No. 73-36. The Proposed July 2016 Agreement would have paid Plaintiff a three-percent commission based on manufacturing cost for current purchase orders, and a three-percent commission based on sales price for future purchase orders. *Id.* Post-termination commission payments, however, would have been limited to a five-year period, not paid for the life of the product. *Id.* Neither side signed the Proposed July 2016 Agreement.

In September 2016, Plaintiff countered with another proposed sales representative agreement ("Proposed September 2016 Agreement"). Dkt. No. 73-39. The Proposed September 2016 Agreement provided that commissions would have been paid "at the standard rate of three percent (3%) on the sales price," not on manufacturing cost. *Id.* It further proposed that post-termination commissions be paid for the life of the product, not limited by a five-year cap. Again, Defendant did not sign the Proposed September 2016 Agreement, and with negotiations going

nowhere, Defendant elected to terminate its relationship with Plaintiff effective January 5, 2017. Dkt. No. 73, p. 19 (Pg. ID 1297); Dkt. No. 73-44; Dkt. No. 84, p. 18 (Pg. ID 1788). Following this action, Plaintiff initiated the instant suit alleging a breach of contract.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers a court to grant summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1968). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere allegations or denials in the non-movant's pleadings will not suffice, nor will a mere scintilla of evidence supporting the non-moving party. *Id.* at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *Id.* at 252.

### IV. DISCUSSION

Defendant moves for summary judgment on three claims encompassed within Plaintiff's First Amended Complaint. First, Defendant moves for summary

judgment on Plaintiff's claim that it is entitled to commissions based on sales price. Dkt. No. 73, p. 3 (Pg. ID 1281). Second, Defendant moves for summary judgment on Plaintiff's claim that it is entitled to post-termination commissions "for the life of the part." *Id.*[1] Finally, Defendant moves for summary judgment on Plaintiff's claim that it is entitled to commissions for sales to customers Nexteer, Wabco, and American Axle. *Id.* The Court will discuss each of these matters below.

### A. No Reasonable Juror Could Conclude that Defendant Assented to All Material Terms in the Proposed April 2015 Agreement.

Defendant's first two requests for relief relate to Plaintiff's claim that Defendant agreed to be bound by the Proposed April 2015 Agreement. *See* Dkt. No. 22. While Plaintiff suggests there is a question of material fact surrounding this issue, the record clearly demonstrates that there was no mutual assent on all material terms in that proposed agreement.

"The elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the

---

[1] With respect to these first two requests for relief, the Court will construe this as a motion seeking summary judgment only to the extent that Plaintiff's Complaint alleges Defendant was bound by and breached the material terms of the Proposed April 2015 Agreement. That is the basis for Counts One and Two of the First Amended Complaint.

other party injury." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).  At issue here is the first of these four elements.

In establishing the existence of a contract, it must be shown that the parties had a meeting of the minds on all essential terms.  *Global Fleet Sales, LLC v. Delunas*, 203 F. Supp. 3d 789, 817 (E.D. Mich. 2016) (citing *Calhoun Cty. v. Blue Cross Blue Shield Michigan*, 297 Mich. App. 1, 824 N.W. 2d 202, 209 (2012)).  Whether the parties reached a meeting of the minds is a question of fact.  *Id.*  It is judged by an objective standard, "looking to the express words of the parties and their visible acts, not their subjective states of mind."  *Id.* (quoting *Stanton v. Dachille*, 186 Mich. App. 247, 463 N.W. 2d 479, 483 (1990)); *see also Innotext, Inc. v. Petra'Lex USA Inc.*, 694 F.3d 581, 594 (6th Cir. 2012) (holding an implied-in-fact contract requires mutual assent to the essential terms of the contract, evidenced by the parties' course of dealing).

Under Michigan law, an agreement to agree "may be just as valid as any other contract."  *Wirt v. Ticona Polymers, Inc.*, 2006 WL 2660606, at *7 (E.D. Mich. Sept. 14, 2006) (quoting *Ford Motor Co. v. Kahne*, 379 F. Supp. 2d 857, 869 (E.D. Mich. 2005)).  But "[s]uch an agreement, just like any other sort of contract, may be enforced only if the parties specify and mutually assent to all 'material and essential terms, leaving none to be agreed as a result of future

negotiations.'" *Id.* (quoting *Kahne*, 379 F. Supp. 2d at 869); *see also Hansen v. Catsman*, 371 Mich. 79, 123 N.W. 2d 265, 266 (1963) ("If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all.").

Here, the record shows that the parties continued to negotiate the material terms of the Proposed April 2015 Agreement, but never reached a mutual agreement on all of those terms. Indeed, throughout the record, there are examples of Plaintiff acknowledging Defendant's concern with at least one material provision in the Proposed April 2015 Agreement surrounding post-termination commissions. For example, in an email that Plaintiff sent to Defendant on October 8, 2015, Plaintiff wrote the following:

> Our understanding is your main concern is if [Plaintiff] stops representing [Defendant] that [Defendant] is liable for all commissions for the remaining life of the programs in which business was obtained by [Plaintiff]. We will await a more formal response to this concern.

Dkt. No. 73-21, p. 2 (Pg. ID 1421). Subsequently, Defendant replied that it would work on drafting a response to the Proposed April 2015 Agreement that addressed "all concerns from both sides." Certainly, the parties had not yet come to terms on all material aspects of an agreement.

In addition, Defendant went on to raise another concern with the Proposed April 2015 Agreement. In an email sent to Plaintiff on February 25, 2016,

Defendant sought to confirm whether commissions under a new agreement would be payable on "3% of manufacturing cost." Dkt. No. 73-29, p. (Pg. ID 1463). Plaintiff objected to this structure, insisting that commissions be paid on sales price. Dkt. No. 73-30, p. 3 (Pg. ID 1472). Hence, the parties were now at another impasse.

While Plaintiff characterizes this exchange as an attempt by Defendant to renege on a prior agreement, Plaintiff's own words highlight the fact that it understood the parties were still negotiating a deal. In the same email Plaintiff sent insisting that commissions be paid on sales price, Plaintiff wrote: "We clearly have an agreement for [Plaintiff] to represent [Defendant]. We just need to finalize the compensation terms." *See id.* In other correspondence, Plaintiff wrote things such as, "We still need to reach an agreement as the correct commission rate to be applied to the sales price. We look forward to working with you to finalize our agreement on these points." *See e.g.*, Dkt. No. 73-33; Dkt. No. 73-34; Dkt. No. 73-35. Undoubtedly, Plaintiff was acknowledging that the parties had yet to finalize an agreement on all material terms. The Court cannot ignore the implications of Plaintiff's own words.

Even in the face of this evidence, Plaintiff maintains that the parties had a binding oral agreement. In support, Plaintiff cites primarily to two cases. First, the Sixth Circuit's opinion in *Innotext, Inc. v. Petra'Lex USA Inc. See* 694 F.3d 581

(6th Cir. 2012). And second, Eastern District of Michigan Judge Laurie Michelson's decision in *Automotive Interior Innovations, LLC v. Mata AHSAP VE Otomotiv Tic San As*. *See* 2015 WL 4162489 (E.D. Mich. July 9, 2015). Neither of these cases are dispositive of the issue at hand, but the second warrants further discussion.

In *Automotive Interior*, the court highlighted that under Michigan Law, "if the parties indicate that the expected document is to be a mere 'memorial' of operative facts already existing, its nonexistence does not prevent those facts from having their normal legal operation." *Id.* at *11 (quoting *Michigan Broad. Co. v. Shawd*, 352 Mich. 453, 90 N.W. 2d 451, 453 (Mich. 1958). Stated differently, if two parties intend to reach an agreement on all material terms before reducing their agreement to writing, the fact that the parties never execute a written document does not prevent them from being bound by their oral agreement. *See id.* But that is not what happened here. Importantly, there is no credible evidence suggesting the parties had come to a verbal agreement on all material terms of a contract -- a prerequisite for the principle highlighted in *Automotive Interiors* to apply. *See id.* at *11.

Plaintiff alleges that Defendant verbally agreed to the terms reflected in the Proposed April 2015 Agreement on three different occasions. First, during a phone conversation in April 2014. Dkt. No. 84-3, p. 26 (Pg. ID 1847). Second,

during a meeting in April 2015. Dkt. No. 84, pp. 13-15 (Pg. ID 1783-85). And third, during a meeting in October 2015. *See id.* However, the truth of these claims is contradicted by several pieces of evidence that the Court has already highlighted. Particularly, Plaintiff, on multiple occasions, acknowledged that Defendant had a concern with at least one material provision in the Proposed April 2015 Agreement surrounding post-termination commissions. *See e.g.*, Dkt. No. 73-21; Dkt. No. 73-22. Further, Plaintiff repeatedly admitted that the parties had yet to "finalize" an agreement. *See e.g.*, Dkt. No. 73-30, p. 3 (Pg. ID 1472); Dkt. No. 73-33; Dkt. No. 73-34; Dkt. No. 73-35. These are not communications consistent with two parties who had reached a mutual agreement on all material terms of the Proposed April 2015 Agreement.

Plaintiff alternatively argues that Defendant's conduct showed it was acting in conformance with at least one part of the Proposed April 2015 Agreement -- the life of the product provision. *See* Dkt. No. 84, pp. 12-13 (Pg. ID 1782-83). Specifically, Plaintiff alleges that Defendant continued paying commissions on several parts that were covered under the parties' old, expired sales representation agreement. *Id.* Because Defendant continued making such payments, Plaintiff suggests this supports the overall conclusion that Defendant agreed to all material terms in the Proposed April 2015 Agreement. *See id.* The Court will disagree. Certainly, Defendant's conduct suggests the parties had an intent to continue their

business relationship. But the record is still replete with examples of Plaintiff acknowledging that both sides had yet to finalize an agreement. The Court cannot ignore Plaintiff's own words.

In short, the Court has highlighted several examples throughout the record demonstrating that the parties continued to negotiate the terms of a contract covering new business. While the nearly two-year delay on the part of Defendant is troubling, nothing in Defendant's expressions or actions suggested it assented to all material terms of the Proposed April 2015 Agreement. Accordingly, the Court will Grant Defendant's Motion for Partial Summary to the extent it challenges whether it was bound by and breached the material terms of the Proposed April 2015 Agreement. This will resolve Counts One and Two of the First Amended Complaint.

### B. A Material Question of Fact Remains Surrounding Whether Plaintiff is Entitled to Commissions for Sales to Customers Nexteer, Wabco, and American Axle.

Next, Defendant moves for summary judgment on any claim to commissions Plaintiff may make related to customers Nexteer, Wabco, and American Axle. Defendant argues that Plaintiff did not procure this business, and thus, is not entitled to compensation. The Court, however, finds that a material question of fact remains surrounding this issue.

Importantly, it is unsettled what expectations governed the parties' continued business relationship following the expiration of their old sales representation agreement on March 31, 2009. The reason for this uncertainty is that both sides agreed in writing: "We do not intend to renew the [above-referenced] agreement thereafter and same shall then stand cancelled." *See* Dkt. No. 73-10. As Defendant acknowledges, the agreement ceased to have any legal effect beyond that date. *See* Dkt. No. 73, p. 12 (Pg. ID 1290). Nevertheless, the parties continued their business relationship and undoubtedly had an understanding that Plaintiff would at least be compensated for its services.

While not controlling, the language of the parties' now-expired sales representation agreement is instructive. That agreement provided that Plaintiff was responsible for using its reasonable efforts to "assist [Defendant] in obtaining Sales and implementing product, marketing and sales objectives." Dkt. No. 73-4. Even where Defendant directly negotiated a deal, Plaintiff was entitled to a reduced commission where it assisted Defendant in finalizing these orders or where it provided ongoing support services. *Id.* As this language suggests, there were a multitude of ways in which Plaintiff could earn a commission under this old agreement.

Fast-forward to today, because it is unclear what exactly Plaintiff was required to do under the parties' new business relationship, a material question of

fact remains surrounding whether Plaintiff is entitled to commission payments for sales to customers Nexteer, Wabco, and American Axle. *See Miller v. Hinkle Mfg., LLC*, 2014 WL 5307145, at *6 (E.D. Mich. Oct. 16, 2014) (holding where it is unclear which conditions agent had to meet to receive commission payment, a material question of fact exists with respect to whether agent was the procuring cause of sale); s*ee also Jack Peddie & Assoc., Inc. v. Whitmor Mfg. Co., Inc.*, 980 F.2d 729, at *5 (6th Cir. 1992) (Unpublished) (quoting *Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 1992 WL 124336, at *6 (S.D. Ohio May 27, 1992) ("[T]he procuring cause doctrine gives to an agent the right to receive a commission where the agent has done substantially that which was required of him under the terms of his contract. Thus, the doctrine works in conjunction with, and not in place of, the agreement between the parties.")). Accordingly, the Court will Deny Defendant's request for relief.

## V. CONCLUSION

For the reasons stated herein, the Court will GRANT Defendant's Motion for Partial Summary Judgment [#73] IN PART and DENY the Motion IN PART. Consequently, Counts One and Two of the First Amended Complaint are hereby DISMISSED.

IT IS SO ORDERED.

Dated: March 8, 2019

s/Gershwin A. Drain  
HON. GERSHWIN A. DRAIN  
United States District Court Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 8, 2019, by electronic and/or ordinary mail.

s/Teresa McGovern  
Case Manager